## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

| | | |
|---|---|---|
| STEVE C. WILLIAMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:14-cv-00524-NKL |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

Plaintiff Steve C. Williams appeals the Commissioner of Social Security's final decision denying his application for disability insurance benefits. The decision is affirmed.

### I. Background

Williams was born in 1960. He alleges he became disabled beginning May 9, 2012, when he had a heart attack. He filed his application for benefits on August 31, 2012, and a hearing was held October 10, 2013. A supplemental hearing was held January 16, 2014 for purposes of obtaining testimony from a medical expert. The ALJ denied Williams' application on February 14, 2014, and the Appeals Council denied his request for review on April 24, 2014. The relevant period for purposes of Williams' claim is May 9, 2012 through February 14, 2014.

#### A. Medical history and opinion evidence

On May 9, 2012, Williams went to the emergency room for intermittent chest pain that radiated down the left arm. Williams was admitted for cardiac catheterization, which showed a left ventricle ejection fraction of 25-30%, severe hypokineses in the interoapical myocardium, and critical stenosis in the proximal left anterior descending coronary artery. Williams had

angioplasty and a stent was placed.  The next day, he had an echocardiogram which showed his ejection fraction had improved to 50-55 %, which was within normal limits.  He was discharged on May 11, 2012.

Williams followed up with his primary care physician, Dr. Daljeet Singh, on May 15, 2012.  Dr. Singh continued Williams' medications, recommended cardiac rehabilitation, and that Williams be off work for four to six weeks.

Williams also followed up with Carondelet Cardiology Services on May 22, 2012, when he saw Faith Cordle, F.N., A.C.N.S.-B.C.  He reported no more chest pain, dyspnea, or syncope but complained of soreness in the right arm. Cordle assessed coronary artery disease, status post PTCA, mixed hyperlipidemia, and tobacco dependence.  She recommended he stop smoking, noting he had reduced his use to one pack per day.  She also prescribed aspirin, and Tylenol for the right arm.  She also recommended cardiac rehabilitation, and instructed Williams to return for a lipid profile in six weeks.

Williams returned to Carondelet Cardiology Services on June 11, 2012 and saw Dr. Daniel Dunker. Williams reported no significant, recurrent chest discomfort, but did complain of a grabbing sensation in the chest after smoking too much or when his diabetes was out of control.  He had not yet enrolled in cardiac rehabilitation.  Dr. Dunker prescribed nicotine patches, and recommended cardiac rehabilitation.

On June 20, 2012, Williams saw Dr. Singh for follow-up.  Dr. Singh noted very poor exercise tolerance and that Williams could not walk any distance without becoming out of breath. Williams also reported intermittent chest pain, rating it at a level of two on a scale of one to ten, and increasingly severe headaches.  Dr. Singh assessed chronic headaches, pituitary adenoma, diabetes mellitus, and coronary artery disease.  Because Williams had undergone a

2

transphenoidal hypophysectomy in 1997 due to a pituitary adenoma, Dr. Singh ordered a CT scan of the head and labs.

On June 25, 2012, Williams returned to Dr. Singh to review the labs. Williams' prolactin was high at 194.6, indicating possible recurrence of his pituitary tumor.

On July 18, 2012, Williams saw Dr. Singh again. Physical exam was unremarkable. They also discussed the CT results. The radiologist who prepared the CT report recommended further evaluation with MRI. Dr. Singh noted again that with the emergence of headaches, returning to work would be difficult and advised extended time off work due to serious medical problems.

Williams followed up with Dr. Singh on August 10, 2012, complaining of dizzy spells and positional vertigo. Physical exam was unremarkable. Dr. Singh prescribed a trial of meclizine.

On August 15, 2012, Williams had an MRI, which showed that the anterior aspect of the pituitary gland was expanded, suspicious for microadenoma, and several foci of abnormality involving the frontal white matter bilaterally on the inversion recover pulse sequence. Dr. Singh noted that the MRI failed to reveal a perceptible tumor on the pituitary gland, though noting Williams' prolactin levels were still "very high." [Tr. 408-09.] Williams reported continued headaches and seizures. His current medications, including aspirin, glyburide, thiamine, Zocor, Coreg, fish oil, aldactone, Lisinopril, pantoprazole, Lasix, nitrostat, and Plavix, were continued.

Williams returned for to Dr. Singh on October 1, 2012 for follow up and disability evaluation. Dr. Singh completed forms and also referred Williams to a neurologist.

On November 21, 2012, Williams saw neurologist Dr. John Harlan. Williams reported seizures, fatigue, mood change, nocturnal awakening, and a headache between the eyes.

Dr. Harlan observed Williams to be unkempt, loud and interrupting, and impulsive. After an exam and review of the MRI, Dr. Harlan assessed pituitary adenoma, early awakening, dissociative fugue, chronic headaches, and pseudobulbar affect, noting that "bifrontal [white matter] lesions may explain this." [Tr. 455-56.] He prescribed Mirtazapine for sleep, mood, and tremor, and recommended a neurosurgery evaluation.

Williams was evaluated by neurosurgeon Dr. Steven Wilkinson on December 12, 2012. Williams reported a headache every three to four days, each lasting a few hours. Dr. Wilkinson noted he did not see any significant change between the recent MRI and an old one. Physical examination revealed intact higher cortical functions, full visual fields, equal muscle strength with normal muscle tone, intact sensation, normal cerebellar function, and a well-preserved gait. The doctor assessed pituitary adenoma, but noted, "I think that most of this is just residual. If there is some significant residual microadenoma, it does not appear to be producing significant hormone load since his prolactin level is not that highly elevated." [Tr. 472.] He noted Williams was reluctant to consider any further treatment, but the doctor "was not necessarily sure [Williams] need[ed] it, honestly, at this point." [Tr. 22, 470-72.]

On February 5, 2013, Williams followed up with Dr. Singh, complaining of shoulder and heel pain, but had no complaints relating to his cardiac condition or diabetes. Upon examination, range of motion was normal, but with pain on shoulder abduction. Dr. Singh recommended heat and ibuprofen for the shoulder. Dr. Singh also assessed plantar fasciitis and recommended the use of heel cups. Williams' cardiovascular exam was normal, as was the remainder of the physical exam.

Williams saw Dr. Singh on April 16, 2013 regarding abnormal labs, which showed hyperglycemia and renal insufficiency. Physical exam was normal. Dr. Singh prescribed

4

Metformin and indicated Williams needed a neurosurgery or endocrinology evaluation relating to the pituitary adenoma.[1]

On May 19, 2013, Williams went to the emergency room for abdominal pain. An x-ray was normal, but a CT scan showed a ureteral stone and a right adrenal gland mass. He was given sodium chloride, Ketorolac, Thomethamine, and dydromorphone, and was instructed to follow up with Dr. Singh regarding the adrenal gland mass.

Williams saw Dr. Singh on September 24, 2013. Williams was still smoking one pack of cigarettes per day, and was not ready to quit. Dr. Singh assessed pituitary adenoma, diabetes mellitus, coronary artery disease, chronic headaches, and renal insufficiency.

Williams began seeing a psychiatrist, Dr. Mohammed Chowdhury, in April 2013. Williams reported depression and anxiety, occasional suicidal ideation, daily mood swings, and trouble sleeping. A mental status examination was grossly normal. Williams was smiling and laughing during the interview, and Dr. Chowdhury noted mood incongruent with depression. The doctor further noted, "not sure if looking for depression diagnosis to help with disability." [Tr. 494-95] Dr. Chowdhury assessed major depressive disorder moderate, rule out substance

---

[1] Dr. Singh's record appears to contain a scrivener's error, and that error caused the ALJ to twice state in the written decision, apparently incorrectly, that Williams began taking medication for pituitary adenoma in April 2013. [Tr. 22, Tr.464-65.] Specifically, Dr. Singh's record of the April 2013 office visit notes, among other things, that Williams' blood glucose was high, as well as that the doctor wanted to further investigate Williams' pituitary adenoma. The "Assessment" portion of Dr. Singh's record includes the following: "1. Pituitary adenoma - 227.3 (Primary), --this needs NSurg or ENDO f/u to see if Parlodel Rx an option." [Tr. 465.] The "Plan" portion that immediately follows includes: "1. Pituitary adenoma**,** Start Metformin HCI Tablet, 500 MG, 1 tablet with meals, Orally, Twice a day, 30 day(s), 60." [*Id.*] In other words, the doctor's Assessment was that Williams needed a neurosurgery or endocrinology follow up to see whether a trial of Parlodel, a medication used to treat elevated prolactin levels, was warranted. Williams' blood glucose was elevated, and the Metformin, prescribed by Dr. Singh, treats high blood glucose. The inclusion of the Metformin prescription under the "Plan" for the pituitary adenoma thus appears to be a scrivener's error by Dr. Singh.

Therefore, Williams does not appear to have been started on medication for pituitary adenoma in April 2013. Nor does Williams claim, in his briefing herein, to have been.

use, rule out adjustment disorder, with a Global Assessment of Functioning score of 46, and prescribed Zoloft and Neurontin. Williams continued seeing Dr. Chowdhury for medication management. Williams also had outpatient therapy sessions with Lisa McClain, LCSW, MSW, and two sessions with Dr. Sean Sargent. In November 2013, Williams told Dr. Chowdhury he was applying for disability and wanted a medical diagnosis in the record. [Tr. 546.] Mental status exam at that visit reflected, among other things, that Williams had unimpaired judgment and impulse control, neat grooming and good hygiene; a safety assessment indicated no current anger, impulsivity, or hostility. [Tr. 547.]

### B. Opinion Evidence

On December 11, 2012, Williams had a consultative examination at the request of Disability Determinations Services, with neurologist John Sand, M.D. Dr. Sand was not provided any previous medical records. The doctor noted obesity, but the physical examination was otherwise grossly normal. The doctor assessed a tension-type headache unspecified, successfully controlled with ibuprofen, and found no neurological limitations on Williams' ability to work. [Tr. 427-29.] The ALJ gave Dr. Sand's opinion great weight.

On December 12, 2012, state agency physician Denise Trowbridge, M.D. reviewed Williams' medical records available at the time and opined Williams could perform light work; and had the ability to lift 10 pounds frequently and 20 pounds occasionally, sit six out of eight hours, and stand or walk six out of eight hours. Dr. Trowbridge further opined that due to Williams' history of pituitary adenoma, he would be limited in his concentration and ability to use ladders safely. She also found him limited with respect to jobs requiring even moderate exposure to hazards such as machinery and heights. [Tr. 104-06.]

On January 3, 2013, Williams had a consultative examination by Jane W. Ruedi, Ph.D.

6

[Tr. 430-33.]  During their interview, Williams reported two prior hospitalizations following suicide attempts, having used marijuana as a teen, and a history of drinking and abuse of Vicodin.  Dr. Ruedi observed Williams was disheveled.  He appeared adequately able to express his thoughts, though his articulation was poor at points.  She noted he could understand and remember instructions and sustain concentration in short tasks.  She further noted, "In the one on one setting[, Williams] demonstrated good social skills and his work history suggests that he is capable of interacting socially and adapting to his environment."  [Tr. 430-433.]  Her diagnostic impression was major depressive disorder, recurrent; and generalized anxiety disorder with a GAF score of 60.  The ALJ gave Dr. Ruedi's opinion great weight.

On January 14, 2013, state agency psychologist Raphael Smith, Psy.D., reviewed Williams' medical records. [Tr. 102-07.]  Dr. Smith opined that Williams had a moderate restriction of his activities of daily living; mild difficulties in maintaining social functioning; mild difficulties maintaining concentration, persistence, or pace; and no episodes of decompensation.  As for Williams' mental RFC, Dr. Smith opined that Williams retained the ability to understand, remember, and carry out simple instructions and could work in an environment that does not require frequent work in coordination or proximity to others.

Dr. Singh, Williams' treating physician, noted on July 18, 2012, "with emergence of headache due to his pituitary tumor his going back to work will be difficult."  [Tr. 414.]  On October 1, 2012, Dr. Singh completed a form titled "Physician's Residual Functional Capacity." [Tr. 401-05.]  Dr. Singh indicated Williams could lift 10 pounds frequently, sit four out of eight hours, stand or walk a total of two out of eight hours, and would need to elevate his feet one hour per workday.  He noted Williams has "frequently debilitating" pain, "occasionally debilitating" fatigue, and a short attention span.   [Tr. 404.]  He also noted Williams would miss work more

7

than three times per month and was unable to drive due to seizures.  On a separate form, Dr. Singh indicated Williams was unable to perform an exercise tolerance test.

On October 8, 2013, Dr. Singh again completed the Physician's Residual Functional Capacity form, indicating similar conclusions, except that he noted Williams could only stand or walk less than one hour per eight hour workday, and could no longer use his hands and arms for activities requiring repetitive motion or the pushing and pulling of arm controls.  He also noted that pain would be debilitating and fatigue would be frequently debilitating.  [Tr. 535-38.]

At the supplemental hearing of January 16, 2013, cardiologist George Oliver, M.D., testified as a medical expert.  Dr. Oliver testified that based upon his review of the medical records, Williams' angioplasty and stenting was successful, with no narrowing in the previously blocked artery and an ejection fraction of 50 to 55%, which was within normal limits.  [Tr. 85-86.]  Dr. Oliver noted Williams had not had a stress test since the surgery.  The doctor also noted Williams had not complained of chest pain since the surgery, either, and opined he had "no reason to think…[Williams] couldn't do at least ordinary physical activity."  [Tr. 86-87.]  The ALJ gave Dr. Oliver's testimony great weight.

### C.  Williams' testimony and function reports

Williams dropped out of high school in the tenth grade.  He testified that he reads and spells at an elementary school level.  From 1993 until 2012, he worked as a welder, tool setter, packer, and loader.  He testified that several years ago, when he lived in Salt Lake City, he made a suicide attempt and was hospitalized.  He had a heart attack on May 9, 2012 and has not worked since then.

Before his heart attack, he smoked three packs a day.  Since his heart attack, he smokes one pack a day.  After he had the heart attack and was discharged from the hospital, he was

prescribed some medication for cholesterol that caused him severe diarrhea and suicidal mood swings. He has a severe headache about every three days. If he is too physically active, such as when he is doing too much cleaning, he can have chest pain. He testified that has a short attention span and becomes fatigued. He stopped driving after the October 2013 hearing.

Williams lives with his wife and three children. His wife and a son filled out Third Party reports in September 2012, indicating Williams goes outside two or three times per day, walks his children to school, paints, does some yard work, does some house work, watches television and uses the computer, drives, rides in cars, and shops. They indicated he needs reminders and has trouble getting along with others.

### D. The ALJ's decision

The ALJ found that during the relevant time period, Williams had severe impairments of status post-stent placement and angioplasty; diabetes mellitus; depression; and obesity. [Tr. 17.] The ALJ also found Williams did not meet Listing 4.04, Ischemic Heart Disease; Listing 11.14, Peripheral Neuropathies; or Listing 12.04, Affective Disorders.

The ALJ found Williams has the residual functional capacity to perform:

> [L]ight work as defined in 20 CFR § 404.1567(b). Specifically, claimant is able to sit for 6 hours out of 8 hours; and he can stand and walk in combination for 6 hours out of 8 hours. Claimant is able to lift, carry, push, or pull 10 pounds frequently and up to 20 pounds occasionally. He can never climb ladders, ropes, or scaffolding. Claimant can occasionally climb stairs or ramps; stoop; kneel; crouch; and crawl.
>
> Environmentally, claimant must have an indoor work environment. He can never be exposed to extreme temperatures of heat or cold. He must never be exposed to hazards, such as dangerous machinery or unprotected heights.
>
> Mentally, claimant should never be expected to understand, remember, or carry out detailed instructions. His job duties must be simple, repetitive, and routine in nature. Claimant should never

9

be expected to exercise independent judgment regarding the nature of his job duties.

[Tr. 19.]

With respect to the opinion evidence, the ALJ gave no weight to the opinion of Dr. Singh; and great weight to the opinions of Drs. Sand, Ruedi, and Oliver. [Tr. 24-25.]

The ALJ found Williams' subjective statements concerning the intensity, persistence and limiting effects of symptoms "not entirely credible[,]" and that there was "no medically determinable or otherwise credible reason why [Williams] cannot perform a range of light work, subject to non-exertional limitations" cited in the decision. [Tr. 25.]

The ALJ concluded Williams could no longer perform his past relevant work as a welder, tool setter, packer, or loader. However, the ALJ found Williams could adjust to other work existing in significant numbers in the national economy, such as folding machine operator, electrical assembler, and mail router, and therefore is not disabled.

## II.    Discussion

Williams argues the ALJ failed to properly identify all of Williams' severe impairments, specifically, history of pituitary tumor. Williams also argues the ALJ failed to properly evaluate the medical opinion evidence, by relying too heavily on a non-examining expert opinion and misstating the record.

The Commissioner's findings are reversed "only if they are not supported by substantial evidence or result from an error of law." *Byes v. Astrue*, 687 F.3d 913, 915 (8th Cir. 2012). Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support the Commissioner's conclusions. *See Juszczyk v. Astrue,* 542 F.3d 626, 631 (8th Cir. 2008). "If substantial evidence supports the Commissioner's conclusions, [the Court] does not reverse even if it would reach a different conclusion, or merely because

10

substantial evidence also supports the contrary outcome." *Byers*, 687 at 915.

### A.  Severe impairments

Williams argues the ALJ missed a severe impairment at Step 2, history of pituitary adenoma. But the ALJ discussed the evidence with respect to that condition, and substantial evidence supports the ALJ's decision to exclude it as a severe impairment.

As a preliminary matter, although Williams alluded to mood swings, attention span, fatigue, and depression at the hearing, he did not allege disability on the basis of his history of pituitary adenoma in his application, nor so complain at his hearing.  An ALJ need not "investigate a claim not presented at the time of the application for benefits and not offered at the hearing as a basis for disability." *Mouser v. Astrue,* 545 F.32d 634, 639 (8ᵗʰ Cir. 2008).

In any event, Williams failed to demonstrate that his history of pituitary adenoma was related to a medically determinable impairment that more than minimally affected his ability to perform work-related functions. *See Kirby v. Astrue,* 500 F.3d 705, 707 (8ᵗʰ Cir. 2007) (claimant bears burden to severe impairments); 20 C.F.R. § 404.1251.  The ALJ expressly recognized Williams' history of a pituitary adenoma that required surgery in 1997, which was well before his May 2012 alleged disability onset date. *See* [Tr. 22.]   As the ALJ observed, Williams was able to work at the substantial gainful activity level after the surgery for several years.  The ALJ also considered the records of Dr. Wilkinson, to whom Williams was referred in December 2012. Dr. Wilkinson stated that he had compared Williams' older MRI study with the more recent one, and was "not really convinced that there is a large amount of difference."  [Tr. 470.]  As the ALJ further noted, Dr. Wilkinson's physical examination revealed intact higher cortical functions, full visual fields, equal muscle strength with normal muscle tone, intact sensation, normal cerebellar function, and a well-preserved gait, and noted that any effect of the pituitary adenoma were "just

11

residual." [Tr. 21, 472.] The doctor noted Williams was reluctant to consider any further treatment, but the doctor was not sure Williams needed further treatment in any event. [Tr. 22, 470-72.]

Dr. Sand, the examining consultant who saw Williams in December 2012, found no neurological limitations on Williams' ability to work. Williams' history of headache, as reported to Dr. Sand, involved tension-type headache that resolved with ibuprofen. Symptoms that may be successfully controlled with medication do not indicate a disabling condition. *Renstrom v. Astrue,* 680 F.3d 1057, 1066 (8th Cir. 2012) (explaining that an impairment is not disabling if controlled by treatment or medication).

Williams failed to carry his burden of demonstrating the history of pituitary adenoma was a severe impairment, and the ALJ's exclusion of the diagnosis was supported by substantial evidence. Therefore, the ALJ's findings with respect to severe impairments will not be disturbed.

### B.  Evaluation of medical opinion evidence

Williams argues the ALJ failed to properly evaluate the medical opinion evidence by relying too heavily on non-treating experts' opinions, and misstating the record.

The ALJ is charged with the responsibility of resolving conflicts among medical opinions, including conflicts among the various treating and examining physicians. *Finch v. Astrue*, 547 F.3d 933, 936 (8th Cir. 2008). An "ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions [of] any of the claimant's physicians," *Martise v. Astrue*, 641 F.3d 909, 927 (8th Cir. 2011) (internal quotation and citation omitted), nor is an ALJ required to give the most weight to the opinion of a treating medical source. The amount of weight given a treating medical source opinion depends upon support for the opinion

found in the record; its consistency with the record; and whether it rests upon conclusory statements.  An ALJ must give controlling weight to a treating medical source opinion if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence.  *Papesh v. Colvin,* 786 F.3d 1126, 1132 (8th Cir. 2015) (*quoting Wagner v. Astrue,* 499 F.3d 842, 848-49 (8th Cir. 2007)).  Under S.S.R. 96-2p, "Policy Interpretation Ruling, Titles II and XVI: Giving Controlling Weight to Treating Source Medical Opinions," the term "'not inconsistent'…indicate[s] that a well-supported treating source medical opinion need not be supported directly by all of the other evidence (*i.e*., it does not have to be consistent with all the other evidence) as long as there is no other substantial evidence in the case record that contradicts or conflicts with the opinion."  1996 WL 374188 (July 2, 1996),

"Even if the [treating physician's] opinion is not entitled to controlling weight, it should not ordinarily be disregarded and is entitled to substantial weight."  *Papesh,* 786 F.3d at 1132 (*citing Samons v. Astrue*, 497 F.3d 813, 818 (8th Cir. 2007)).  The opinion may have "limited weight if it provides conclusory statements only, or is inconsistent with the record." *Id*. (citations omitted). But the ALJ "may discount or even disregard the opinion . . . where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions."  *Id.* (*quoting Miller v. Colvin*, 784 F. 3d 472, 477 (8th Cir. 2015)).  *See also Halverson v. Astrue*, 600 F.3d 922, 930 (8th Cir. 2010) (treating physician's opinion appropriately afforded less weight when inconsistent with clinical treatment notes).  The opinions of specialists can appropriately be given greater weight than those of non-specialists.  *See Brown v. Astrue*, 611 F.3d 941, 953 (8th Cir. 2010) ("Greater weight is generally given to the opinion of a specialist about medical

issues in the area of specialty, than to the opinion of a non-specialist."); and *Halverson v. Astrue*, 600 F.3d 922, 930 (8th Cir. 2010) ("It is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes.").

The ALJ gave the opinion of Dr. Oliver, the consulting, expert cardiologist, great weight. The doctor noted, and the record supports, that testing of Williams' cardiac output immediately after the angioplasty and stenting procedures was within normal limits, and the record included no other cardiac testing indicating abnormal results. Dr. Oliver also noted Williams failed to complain of chest pain. As Williams points out, he in fact complained of chest pain one month after his heart attack. But his complaint was that he had had a grabbing chest pain after smoking too much, and that he could not walk very far. Williams rated the episode a two out of ten on the pain scale. His medical record does not elsewhere reflect multiple or persistent episodes of chest pain. Furthermore, Williams did not enroll in cardiac rehabilitation after his heart attack. Failure to follow treatment recommendations without good reason can lessen a claimant's credibility and can be a basis for denying benefits. *See Dunahoo v. Apfel,* 241 F .3d 1033, 1037 (8th Cir. 2001) (failure to follow prescribed course of treatment may be weighed against claimant's credibility when assessing subjective complaints), and *Kelley v. Barnhart,* 372 F.3d 958, 961 (8th Cir. 2004) ("[A] failure to follow prescribed medical treatment without good cause is a basis for denying benefits."). Also, Williams' testimony and the Third Party reports do not indicate he cannot walk—they reflect he goes outside two or three times a day, walks his children to school, and shops.

Williams argues that the opinion of Dr. Sand, the neuropsychological, examining consultant, should not have been given great weight, because the ALJ failed to explain the reasons why he gave it great weight. An arguable deficiency in opinion writing technique does

14

not mandate reversal when it has no bearing on the outcome. *Robinson v. Sullivan,* 956 F.2d 836, 841 (8th Cir. 1992). Williams additionally complains that Dr. Sand did not note Williams' complaints of having headaches every three to four days, in contrast to Dr. Wilkinson who did note such complaints. But Dr. Wilkinson also noted that ibuprofen helped the headaches significantly. [Tr. 443.] Symptoms that may be successfully controlled with medication do not indicate a disabling condition. *Renstrom,* 680 F.3d at 1066. Therefore, Williams was not prejudiced by the ALJ's reliance on Dr. Sand's opinion. *Samons v. Astrue,* 497 F.3d 813, 821-22 (8th Cir. 2007) (citations omitted) (reversal is necessary only in the case of prejudice or unfairness).

Finally, Williams complains Dr. Sand's opinion failed to include the same subjective symptoms Williams had self-reported to Dr. Harlan, including seizures, or the same observations that Dr. Harlan made, such as that Williams was disheveled. Williams' failure to consistently report seizures is more consistent with the conclusion that Williams has no such symptoms than the possibility that he does have them. In any event, even Dr. Harlan did not opine that Williams' self-reported symptoms, or the observations Dr. Harlan made, required Williams to be limited from work in any way. Williams was not prejudiced. *Id.*

Williams argues the ALJ failed to account for Dr. Smith's opinion that Williams has mild limitations in social functioning. Dr. Smith opined that given Williams' indication of difficulty dealing with stress, it would be best to avoid frequent contact with coworkers and the public, but that Williams has no significant limitations in social functioning. [Tr. 102.] The ALJ gave the opinion some, but not controlling weight, and the RFC does not expressly limit social contact. But the representative occupations the vocational expert identified—folding machine operator, electrical assembler, and mail router—rate interaction with people as "not significant." [Tr. 26,

92-94]. *See also* DOT No. 208.685-014 (folding machine operator: "People: 8 - Taking Instructions—Helping: Not Significant"); DOT No. 729.684-054 (electrical assembler; same); DOT No. 222.587-038 (mail router; same). Williams therefore was not prejudiced by the lack of any express limitation on social functioning in the RFC. *Samons,* 497 F.3d at 821-22.

Dr. Ruedi opined that Williams did fine interacting one-on-one. Williams' argument that the ALJ afforded too much weight to Dr. Ruedi's opinion fails for the same reason that Williams' argument about the weight afforded Dr. Smith's opinion fails. The representative occupations the vocational expert identified do not include significant interaction with others.

In contrast, Dr. Singh's opinions were extreme and not supported by the medical record. The specialists to whom Dr. Singh referred Williams did not recommend treatments or impose limitations inconsistent with work. And Williams did not comply with Dr. Singh's treatment recommendations.

The Court will not disturb the ALJ's decision to give weight given the opinions of Drs. Oliver, Sand, Smith, and Reudi, and none to Dr. Singh's opinions. Substantial evidence in the record as a whole supports the ALJ's evaluation of the opinion evidence, and Williams was not prejudiced.

## III.    Conclusion

The Commissioner's decision is affirmed.

s/ Nanette K. Laughrey<br>
NANETTE K. LAUGHREY<br>
United States District Judge

Dated:   September 10, 2015
Jefferson City, Missouri